528 So.2d 1023 (1988)
Al L. MESHELL, Plaintiff-Appellee,
v.
Sahid C. SHAMSIE and Audubon Insurance Company, Defendants-Appellants.
No. 87-340.
Court of Appeal of Louisiana, Third Circuit.
May 11, 1988.
*1024 E.M. Nichols, Ted Nichols, Lake Charles, for plaintiff-appellee.
Woodley, Barnett, E.E. Woodley, Lake Charles, for defendants-appellants.
Before FORET, STOKER and DOUCET, JJ.
DOUCET, Judge.
Defendants, Sahid C. Shamsie and his insurer, Audubon Insurance Company (Audubon), appeal from a judgment rendered against them and in favor of plaintiff, Al L. Meshell. Plaintiff has answered the appeal seeking an increase in general damages.
On April 14, 1986, plaintiff allegedly tripped and fell over a four-inch high wooden platform on the floor of defendant Shamsie's grocery store, the Park-N-Shop, located in Lake Charles. He subsequently experienced back pain and was diagnosed as suffering from a herniated lumbar disc. On July 22, 1986, plaintiff underwent surgery to remove extruded disc material at the L4-5 level which was pressing on a nerve.
Evidence adduced at trial left the factfinder with a choice between two contradictory versions of the incident in question. Plaintiff and a companion, Kenneth Cornett, went fishing on the morning of April 14, 1986, putting their boat in the water at approximately 10:00 a.m. They finished fishing about 5:00 p.m. While fishing, they drank five or six beers between them with the plaintiff drinking two or three. On the way back to Lake Charles they apparently stopped somewhere for a sandwich and a soft drink, although the recollection of both men on this point is somewhat foggy. The two planned to play cards later that evening *1025 and stopped at defendant's store to buy a six-pack of beer.
According to both plaintiff and Cornett they entered the store and proceeded towards the rear. They passed by the meat counter on their right, turned right then left, and proceeded ahead. The particular section of the aisle which they were allegedly in at this point had a low bin-type freezer on their left and upright glass-doored freezers to their right. The beer coolers were some 25 to 30 feet ahead. Plaintiff testified that he was walking down the aisle when he suddenly thought that he'd passed the beer cooler. He hesitated and turned around facing towards Cornett who was several paces behind him. He said something to Cornett then realized he was mistaken about the beer and began to turn his head around in the direction he had been going. At this point he claimed he tripped backwards over a four-inch high wooden platform which covered a one-inch plastic drain pipe running across the width of the aisle. He fell backwards onto a display of large plastic bottles of soft drinks and landed on the floor.
This fall, it was alleged, caused the injury to his back. When he returned to his truck, plaintiff felt a "little twinge" in his back when he sat down. Later that evening he experienced back discomfort while playing cards with Cornett and their wives. He was treated by a general practitioner for several weeks but was referred to a neurosurgeon after a CT scan showed a possible ruptured disc.
Plaintiff testified that he was not intoxicated at the time of the accident and that it had been two or three hours since he had finished the last of his two or three beers consumed while fishing. He recalled that the wooden structure covering the drain pipe was four to five inches high and three or four feet long. He also stated that a wood soft drink crate was overturned on top of the pipe. He recalled that the entire length of the pipe was not covered and that nothing was on top of the platform. Plaintiff testified that he had been in the store a few times over the past several years and had walked down the aisle in question. On those occasions he had crossed over the platform, actually stepping on it.
Kenneth Cornett was a friend of the plaintiff'sthey lived close together. He had known him for approximately six years and saw him once or twice a week. He corroborated plaintiff's testimony regarding the details of the fishing trip including the splitting of five beers between them. He was three or four feet behind the plaintiff when he tripped. He recalled that plaintiff stopped and turned around because he thought he had passed the beer cooler. Cornett stated that when the plaintiff began to turn back around he tripped over the pipe and fell. Cornett did not see any type of wooden platform or other object over the pipe. All he remembered seeing was the plastic pipe extending across the full width of the aisle. Cornett testified that he had been in the store "10 or 15, maybe 20 times before," and had never seen a wood pallet or empty overturned soft drink crate covering the pipe.
A number of other witnesses testified on behalf of plaintiff, all of whom had been in defendant's store at one time or another. John Beeton, a private investigator employed by plaintiff's counsel, took twelve photos of the area where the accident occurred. The photos depict a small diameter white plastic pipe running across the full width of the aisle. At the time these photos were taken, access across the pipe was blocked by three clear plastic soap displays. Defendants admit that this particular display was not on the floor at the time of the alleged accident. Beeton also testified that he used to buy meat at the store approximately once a month. He had personally walked in the aisle where the pipe runs across the floor and had seen old soft drink crates covering the pipe. Beeton stated that he and his wife used to cross over the crates stepping on them as they passed. He had never seen anything on top of the crates such as merchandise on display. On occasion he recalled seeing no crateapparently meaning that on those occasions the pipe was completely uncovered. The last time he had been in the store before the April 14, 1986 accident was late 1985 or early 1986.
*1026 Sixteen-year old Mack Solice was a friend of the plaintiff's and had been a customer at the store. The youth has a brother, Russell, who is paralyzed from the shoulders down and is confined to a wheelchair. Solice testified that he was in the store with Russell on April 10th, four days before the accident. He recalled the date because it was his birthday. On that day the pipe was "open" there was no "display case" as depicted in Beeton's photographs. While shopping that day Solice walked over the pipe, leaving Russell in his motorized wheelchair on the other side. On another occasion, when Russell was in a lighter, manually operated wheelchair, he and two friends picked up the chair and lifted Russell across the pipe. Solice further testified that the pipe had a soft drink box or something over part of it which he occasionally stepped on while crossing the pipe.
Russell Peavey had known the plaintiff four or five years and had worked with him in the past. He had been a customer at defendant's store for about ten to twelve years and had been down the aisle in question "a bunch of times." He testified he had been in the store between April 17th and 19thafter the accident. He remembered the pipe having a soft drink box "or something" over the middle of itonly part of the pipe was covered. Mr. Peavey used to walk over the pipe on occasion and had never seen a merchandise display over it. Mrs. Russell Peavey had known the plaintiff for a couple of years. She recalled being in the store around March 19, 1986. She saw the soft drink crate turned upside down on the pipe but picked up the front wheels of her shopping basket and crossed over the pipe. She stated, however, that you could have maneuvered a shopping basket around the side of the crate.
Maybell Lewis used to work with plaintiff's wife and had been a customer at defendant's store for up to 20 years. She shopped at the store at least once a week and had been there close to the date of the accident. On that particular occasion she recalled that the pipe was exposed and there was no display over it. She also saw it uncovered after April, 1986. Mrs. Lewis testified that in the past her husband and sister had stumbled on the exposed pipe. She stated that you had to cross the pipe to get to the cold cut cooler. She had never seen a wooden pallet or soft drink case covering the pipe. Sixteen-year old Derek Cornett knew plaintiff and his wife. Derek was a nephew of plaintiff's friend, Kenneth Cornett. Derek was in defendant's store April 17, 1986 and recalled that the pipe was uncovered. Wilson Fontenot was another regular customer and had seen the pipe partially covered by a soft drink crate or a wooden pallet. Billy Thrasher, another friend of the plaintiff's, testified that he had seen the pipe before. In April and May 1986, it was "open" and, later, he noticed that it had been covered.
Plaintiff's wife, Anna Louise, testified that her husband mentioned the accident to her when he and Cornett came home from fishing that evening. At that time, he was just "sore" and was sore for the next few days. She stated that he was not drunk when he came home that evening. Lydia Cornett, Kenneth's wife, testified that neither plaintiff nor her husband appeared intoxicated when they returned from fishing. Another of Kenneth Cornett's nephews, Kevin, was present when plaintiff and his uncle returned from fishing. He testified that neither of the two men were intoxicated.
Sahid C. Shamsie, the owner of the store, was not present when the accident occurred. However, he testified that the pipe in question was covered with a wood pallet and "always had some kind of display" on it. According to Shamsie there was always a display blocking that aisle and that the aisle had not been open in the last eight years. He identified a photograph showing the pipe completely covered with a wooden pallet upon which were stacked cases of tomato sauce, two, three and four cases high. This photograph, along with others, was taken six months after the accident by James Wilkinson, an insurance claims adjuster. According to Shamsie a similar tomato sauce display was in place on the day of the accident. Shamsie testified that he never lets such a display get below two *1027 cases high. He had never seen anyone step or fall over the display.
Hamad Hussein was an assistant store manager who was present on the day of the accident. According to Hussein plaintiff and Cornett did not even walk down the aisle where the pipe was located. He testified that he was changing prices on some frozen potatoes which were in a bin-type freezer unit facing the next aisle over from the one with the pipe running across it. As he was working Hussein claims that he saw plaintiff and Cornett walk behind him, in the aisle where he was working. At the end of the freezer unit he saw plaintiff turn right and bump into the soft drink display. Hussein stated that plaintiff did not fall to the floor but only lost his balance for a moment. According to Hussein, neither plaintiff nor Cornett walked down the aisle with the pipe running across it. Cornett kept walking straight and, after the accident, returned with a twelve-pack of beer. Hussein also stated that on the day of the accident, there had been a tomato sauce display on top of the wooden pallet covering the pipe. He said there was "no way" plaintiff could have passed through there. He estimated that the display was changed up to six times a year and could not recall anyone ever knocking into the display or climbing over it. Hussein testified that at the time of the accident, a stockboy was working in the aisle where the pipe was located.
Sherman Buckley was a stockboy at the store working in the aisle plaintiff and Cornett claimed they walked down. He was placing frozen pizzas in a bin-type freezer at the same time Hussein was working at the freezer in the next aisle. Buckley would have been facing in the direction of that next aisle over. If plaintiff walked down the aisle he claimed he did he would have had to walk behind Buckleyif Buckley's testimony was correct. Buckley saw plaintiff and his friend walking down the next aisle over, towards Hussein. He recalled that the plaintiff turned right and bumped into the soft drink display while Cornett kept going, returning after the accident with a twelve-pack of beer. Buckley also claimed that plaintiff did not fall to the floor. He could tell that plaintiff had been drinking because he was staggering a little and it smelled "kind of like he had a couple of beers or something on him."
Buckley testified that at the time of the accident there was a tomato sauce display over the pipe blocking the aisle in which he was working. He stated that since he has been working at the store there has been some kind of display at that location, covering the pipe. He referred to the staged photograph depicting the tomato sauce display and confirmed that it appeared that way at the time of the accident. Counsel for plaintiff referred to Buckley's deposition in which he stated that on some occasions there was no display on top of the wood pallet. In that deposition, Buckley also stated he knew that on occasion, customers crossed over the pallet to get to the beer cooler. He had never seen anyone climb over the tomato sauce display, however.
A former employee of the store, Hilary Esthay, testified that a tomato sauce display was in place over the pipe on the day of the accident. Esthey did not work the day of the accident but came to work the next morning. He could not recall anyone ever falling over the pipe or display.
Dr. Gerald Litel, a neurosurgeon, first examined plaintiff on June 12, 1986, on a referral from a general practitioner. A myelogram done on July 20th showed a ruptured disc and he performed surgery on July 22nd. He decided to perform the surgery quickly because plaintiff had a weakness in the muscles of his left foot indicating pressure on a nerve caused by the extruded disc material. If this problem had not been corrected soon the function of certain muscles in plaintiff's left foot could have been permanently adversely affected. The pressure on the nerve also caused pain to radiate into plaintiff's leg. Based upon the history given by plaintiff, Dr. Litel felt his injury was consistent with the fall. He felt the operation had been successfula good result when compared to similar operationsand that it provided plaintiff with significant relief. However, even with a good result, Dr. Litel stated that the plaintiff *1028 was left with a 15% to 20% partial/permanent functional disability. He released plaintiff to return to work on October 27, 1986. He restricted him to light duty meaning that he should avoid lifting heavy weights and/or repetitive lifting over an extended period. The doctor felt that by the time of trial, December 1986, plaintiff should have been back to regular work duty if it did not require extended repetitive lifting of heavy weights. He admitted that extent of recovery from such injuries and surgery depends upon the motivation of the affected individual.
Plaintiff's work history showed that at the time of the accident he was awaiting a call to begin a new job. He was a stonesetter and generally worked out of town on specific construction projects. His work typically involved installation of exterior stone (granite, marble, etc.) facings on commercial buildings. He had finished working on his last project in Florida some four weeks before the accident. He had planned to take a few weeks off until his next job commenced. Shortly after the accident he was called to begin a new job but was unable to do so because of his injury. Plaintiff was a supervisor but stated that he performed manual labor almost every day, assisting his workers when necessary. He had served in a supervisory capacity for the past ten "or" fifteen years. After being released by Dr. Litel in October 1986, he contacted his employer but was informed they did not have anything for him in a purely supervisory capacity where he would not have to perform any manual labor. He had been unable to secure employment since the accident and at the time of trial was receiving unemployment compensation.
Plaintiff injured his back in 1977 and had surgery performed shortly thereafter. That surgery was similar to the recent one, but in the previous case extruded disc material was removed from the opposite side of the same disc. Following that 1977 surgery plaintiff returned to work with no limitations within eight to ten months. He had experienced no back problems since that time until the accident in question. Plaintiff also had triple-bypass heart surgery in August 1978. He still takes medication for his heart and since 1978 has been hospitalized on at least two occasions with severe attacks of angina. Following these attacks of angina, plaintiff was temporarily limited in terms of physical exertion. However, generally, his heart condition did not affect his work. Plaintiff's wife testified that he never had any restrictions because of his previous back injury and had no problems doing his work.
Plaintiff presented a number of paycheck stubs showing that at the time of the accident he was earning $16 per hour and some overtime at $24 per hour, as well as a stipend for food and lodging when he worked out of town.
Based upon the above evidence the trial judge found that plaintiff tripped over the wooden platform or box covering the pipe and fell injuring his back. He found that the defendants were liable for his injuries and damages and assessed no fault to the plaintiff. He awarded plaintiff $8,372.64 for medical expenses; $36,400 for past loss of earnings; and $28,000 for pain and suffering.
On appeal defendants cite as error the trial court's finding: (1) that the accident occurred as related by plaintiff and that defendants were liable; and (2) the trial court's failure to address and find that plaintiff was partially at fault in causing the accident. Defendants also cite as error the award of any damages as they were unsupported by the record. Plaintiff has answered the appeal seeking an increase in general damages from $28,000 to $228,000.
Defendants recognize and we reiterate the oft-cited general rule of appellate review of a trial court's findings of fact. An appellate court may not disturb factual findings made by a trial court (judge or jury) unless, (1) the record evidence does not furnish a reasonable basis for the finding, or (2) the evidence furnishes a reasonable basis for the finding but that finding is nonetheless clearly wrong. Virgil v. American Guarantee and Liability Insurance Company, 507 So.2d 825 (La. 1987); Arceneaux v. Domingue, 365 So.2d *1029 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La.1973). This rule is especially applicable to the review of a trial court's factual findings made in a case such as the one at bar where the testimony of opposing witnesses is so directly contradictory on crucial issues.
The trial judge found that the plaintiff and Cornett walked down the aisle in which the pipe ran across the floor and that plaintiff tripped over the wooden platform and fell. By so finding the trial judge rejected the testimony of Hussein, the store's assistant manager, and Buckley, the stockboy, both of whom stated that neither plaintiff nor Cornett walked down that aisle, tripped over the platform, or fell. There is also the question of the tomato sauce display supposedly there on the day of the accident. Hussein, Buckley, and another employee all testified it was there on the day in question. Neither plaintiff nor Cornett testified about such a display. None of the other witnesses who testified on behalf of the plaintiff mentioned ever seeing such a display. Although none of these persons were in the store on the day of the accident several had been in shortly before or shortly thereafter. The trial judge observed these witnesses and made his factual determination. If plaintiff's witnesses could have been biased in his favor defendants' witnesses, all employees or ex-employees of the store, could have been equally biased.
Defendants assert that it was physically impossible for the accident to have occurred as related by plaintiff and Cornett. We find no merit to this argument and find it plausible that plaintiff could have turned around as he was almost at the platform then start to turn back around, shifted his center of balance slightly, and tripped backwards over the platform. Dr. Litel confirmed that the history given by plaintiff was consistent with the ruptured disc although he also said that type of injury could be caused in some individuals by a violent sneeze. It is not disputed that just a few weeks prior to the alleged accident plaintiff was working, at times doing heavy lifting, with no indication of back problems. There is no evidence that the plaintiff is or ever was a malingering individual.
We find the record evidence furnishes a reasonable basis for the trial court's finding that plaintiff injured his back as a result of tripping over the wooden platform and falling. We are unable to say that such a finding was clearly wrong.

LIABILITY OF THE STOREOWNER
We next examine the liability of the storeowner-defendant, Shamsie, accepting the facts as found by the trial judge. We will employ the familiar duty-risk analysis. The following questions are considered in this analysis:
(1) Was the conduct in question a cause-in-fact of the resulting harm?
(2) Was there a duty owed by the defendant to protect the plaintiff from this type of harm arising in this manner?
(3) Did the defendant violate the duty owed?
See Mart v. Hill, 505 So.2d 1120 (La.1987); Hill v. Lundin and Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Crowe, The Anatomy of a Tort, 22 Loy.L.Rev. 903 (1976); McNamara, The Duties and Risks of the Duty-Risk Analysis, 44 La.L.Rev. 1227 (1984).
The conduct in question was defendant-storeowner's maintenance of the wooden platform in what otherwise appears to be an ordinary shopping aisle and/or his failure to warn of the hazard. Accepting the facts as determined by the trial court it is apparent that defendant's conduct was a cause-in-fact of plaintiff's injury and damages.
A storeowner owes an affirmative duty to those who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a safe condition. Kavlich v. Kramer, 315 So.2d 282 (La.1975); Albritton v. J.C. Penney Co., Inc., 385 So.2d 549 (La.App. 3rd Cir.1980); Weaver v. Winn-Dixie of Louisiana, Inc., 406 So.2d 792 (La.App. 4th Cir.1981). This duty extends to warning customers of known dangers. Rodriguez v. New Orleans *1030 Public Service, Inc., 400 So.2d 884 (La.1981); Williams v. Winn-Dixie of Louisiana, Inc., 393 So.2d 680 (La.1981). The duty owed is intended to protect customers of defendant's store from suffering personal injuries arising in a manner such as occurred in the case at bar.
Accepting the facts as determined by the trial court we find that Shamsie breached the duty owed plaintiff, one of his customers. He maintained a dirty, aged wooden platform and/or old wooden soft drink crate over the plastic drain pipe running across the aisle. Once a customer entered the aisle products displayed ahead beckoned him further down the aisle, across the pipe. There was no warning sign posted to alert shoppers of this obstruction in the aisle. We find the record evidence furnishes a reasonable basis for a finding by the trial court that defendant, Shamsie, breached his duty owed to plaintiff. Such a finding is not clearly wrong.

VICTIM FAULT
The trial judge did not address the issue of plaintiff's contributory negligence or comparative fault. Such silence on the part of the trial court is considered a rejection of that defense. See Hatcher v. State, Dept. of Transportation and Development, 478 So.2d 774 (La.App. 3rd Cir.1985), writ denied, 479 So.2d 923 (La.1985); Reed v. Seacoast Products, Inc., 458 So.2d 971 (La.App. 3rd Cir.1984).
Contributory negligence is that conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection. Fusilier v. Northbrook Excess & Surplus Insurance Company, 471 So.2d 761 (La.App. 3rd Cir.1985), writ denied, 472 So.2d 918 (La. 1985); Harris v. Pineset, 499 So.2d 499 (La.App. 2nd Cir.1986), writ denied, 502 So.2d 114 and 502 So.2d 117 (La.1987). Contributory negligence is a question of fact which the party relying on has the burden of establishing. Fusilier, supra; Simmons v. Beauregard Parish School Board, 315 So.2d 883 (La.App. 3rd Cir. 1975), writ denied, 320 So.2d 207 (La.1975).
A customer has a duty to see and avoid obvious hazards. See Bolin v. National Tea Co., 359 So.2d 690 (La.App. 1st Cir.1978). However, in examining evidence in these types of cases the court will take cognizance of the natural tendency of the shopper to focus on the displayed merchandise rather than down at the floor in front of him. Kavlich v. Kramer, supra; Saucier v. Winn-Dixie of Louisiana, Inc., 499 So.2d 1033 (La.App. 3rd Cir.1986); Batiste v. Joyce's Supermarket, 488 So.2d 1318 (La.App. 3rd Cir.1986).
Defendants claim that the wooden platform was obvious to someone exercising reasonable care; that the plaintiff was intoxicated; and that he had been in the store before. It is submitted that all of these facts taken together require a finding that plaintiff was partially at fault in bringing about the accident. The testimony of Hussein and Buckley, defendant's employees, support defendants' argument that plaintiff was intoxicated. However, the testimony of plaintiff, Cornett, their respective wives, and Cornett's nephew refutes that contention. The trial judge clearly accepted plaintiff's testimony regarding the occurrence of the accident over that of Hussein and Buckley. It can be assumed that the trial judge similarly rejected the testimony of those witnesses on the issue of plaintiff's intoxication. The evidence furnishes a reasonable basis for such a finding and we cannot say that it is clearly wrong.
One of plaintiff's witnesses, Mrs. Peavey, testified that the pipe was noticeable but at the same time stated that if you were not looking down "you could easily stumble over the pipe." As previously mentioned it is expected that shoppers will ordinarily be looking at the merchandise on displaynot looking down. The wooden platform which plaintiff allegedly tripped over was four inches high and maybe two feet wide. It was dark, aged wood and was contrasted to some extent against the light gray linoleum floor. Photographs contained in the record show a well-lit area where the platform is located. Most of the jurisprudence in the area of slip or trip and *1031 falls in grocery stores involves a hazard caused by spilled liquid or an item such as a box temporarily present in an aisle. In the case at bar the platform was normally covering the pipe. Most of the regular customers who testified had seen the platform and/or the pipe. Plaintiff himself testified that over the years he had been in the store "a few times." He also remembered walking down the aisle and across the pipe beforeseveral times. On these occasions he stepped on the platform or soft drink crate as he passed over the pipe. Explaining his tripping over something he had previously seen he stated that on this occasion he "wasn't thinking about it." There is no indication when he had last been in the store before this accident.
Because plaintiff had encountered the hazard before and safely negotiated it we feel he was negligent when he failed to recognize and avoid tripping over it on this occasion. We are mindful that he had only walked across the platform several times over the years but nevertheless we conclude that he had a duty to see that which he had seen and avoided tripping over in the past. He breached that duty and his action was a cause-in-fact of his injury and resulting damages. The trial court's finding to the contrary, implicit in its silence, is clearly wrong.

APPORTIONMENT OF FAULT
La.C.C. art. 2323 provides:
"When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss."
In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La. 1985) the Louisiana Supreme Court set forth guidelines for applying the mandate of La.C.C. art. 2323, stating:
"We recognize that a standard for determining percentages of fault has not been provided by the Legislature, and we are therefore presented with an opportunity to offer guidelines as we apportion fault in this instance. In so doing we have looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979), which incorporates direction for the trier of fact. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties."
(footnotes omitted)
The causal relationship between the conduct of Shamsie in maintaining the wooden platform in such a location, in an otherwise ordinary-looking shopping aisle, and the failure to at least warn shoppers of the danger, is direct and substantial. The causal relationship between the plaintiff's conduct in failing to see the platform, having seen it in the past, was not as great. Although we have in effect charged plaintiff with notice of the platform his actions were inadvertent. It was not as if he passed over the object every weekonly several times over a two or three year period. Again, we note that the shopper's *1032 attention is naturally focused on the products displayed in a manner intended to attract his attention. Shamsie knew or should have known of the danger presented by the platform. His conduct created a moderate to substantial risk that someone would trip over it. Considering these factors we conclude that the majority of fault lies with the storeowner. We apportion fault 25% to the plaintiff and 75% to the defendant-storeowner.

QUANTUM
Defendants submit that plaintiff is not entitled to any damages or, alternatively, that the awards of general damages and special damages for loss of income were excessive. Defendants cite no error with regard to the award of special damages for medical expenses incurred by plaintiff as a result of the accident. Plaintiff answered defendant's appeal seeking a tenfold increase in the amount of general damages.
The trial court awarded plaintiff $36,400 as compensation for past lost earnings for 28 weeks. The 28 weeks was measured from the day of the accident, April 14th, to October 27th, the day Dr. Litel released plaintiff to return to light duty work. No award was made for future lost income and we are not concerned with that issue on appeal. As to the figure of $36,400 or, $1,300 per week, the trial judge merely stated, "Considering his wages, it would appear that he's entitled to $36,400.00 in wages."
The last full pay check received by plaintiff was for the week ending March 11, 1986. He received a partial paycheck for the week ending March 18, 1986. He was paid at the rate of $16.00 per hour and received for that last full week $640 in regular pay (40 hrs.) and $504 for 21 hours of overtime. In that last full paycheck he also received $422.07 for housing and meal expenses since he was working in Florida. Plaintiff would not have been entitled to any damages based upon that out-of-town living expense stipend. Check stubs introduced in evidence show that from July 21, 1985 to March 18, 1986 plaintiff received forty-four paychecks averaging 6.06 hours of overtime for each pay period. As of January 21, 1986, he was earning $24 per hour (time and a half) for his overtime workan average of $145.44 per pay period in overtime pay. This figure, $145.44 per week, together with the base weekly pay figure of $640 form the basis for an award of $785.44 per week for 28 weeks or a total of $21,992.32. The trial court erred in awarding $36,400 ($1,300 per week) as past lost wages.
On the issue of general damages we recognize the general rule of appellate review first espoused by the Louisiana Supreme Court in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976) and quoted by court in Reck v. Stevens, 373 So.2d 498 (La.1979) as follows:
"We do re-emphasize, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence."
This rule is based upon a principle of law formerly contained in La.C.C. art. 1934(3) and now set forth in La.C.C. art. 1999 which states:
"When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages."
The trial judge awarded plaintiff $28,000 for "pain and suffering." In his answer to this appeal, plaintiff contends that it is no coincidence that this award can be easily broken down to $1,000 per week for each of the 28 weeks from the day of the accident until plaintiff's release to return to light *1033 duty work. Plaintiff asserts that the trial court simply awarded him $1,000 per week for past pain and suffering and nothing for future pain and suffering and disability. We are inclined to agree with plaintiff. The trial judge awarded only damages for past lost income based upon those same 28 weeks. It appears that the $28,000 for pain and suffering is more probably than not based upon those same 28 weeks, although it might be considered excessive for that relatively short period.
By all accountsDr. Litel's, plaintiff's wife's, and plaintiff's himselfhe has made an excellent recovery from his back injury. At the time of trial however, plaintiff stated that he was still having problems with the muscle function in his foot. Dr. Litel testified that pressure on a nerve by the ruptured disc could have caused this. He also stated that if the pressure on the nerve had not been corrected the muscle function could have been permanently affected. It is apparent that plaintiff is still having some residual problems but there is no evidence that the foot is permanently affected. Dr. Litel also stated that the extent of recovery depends a great deal on the patient's motivation. We note that plaintiff fully recovered from a similar back injury and surgery in 1977. This might be indicative of his motivation to recover in this case. However, as a result of this injury and surgery plaintiff has a 15% to 20% partial/permanent functional disability related to his back. Plaintiff was only 48 years old at the time of trial. Considering plaintiff's permanent functional disability as well as our suspicion that the award for general damages may have been based upon past pain and suffering and disability, we feel that the trial judge abused his discretion in awarding only $28,000 in general damages.
After considering other past awards made or upheld by appellate courts in this state involving similar injuries, but based primarily on the unique facts and circumstances of the case at bar, we feel the lowest award the trial court could have made for general damages is $45,000.
For the reasons assigned we affirm the judgment of the trial court finding that defendant-storeowner was negligent but amend the judgment to apportion fault at 75% to defendant, Sahid Shamsie, and 25% to plaintiff. We further amend the judgment of the trial court to reduce the award of damages for past lost income to $21,992.32 and increase the award of general damages to $45,000, both awards, as well as the $8,372.64 in medical expenses, subject to a reduction by 25%. We recast judgment to read as follows:
IT IS ORDERED, ADJUDGED, AND DECREED that there be and hereby is judgment in favor of Plaintiff, AL L. MESHELL, and against defendants, SAHID C. SHAMSIE and AUDUBON INSURANCE COMPANY, in solido for damages as follows:

Medical expenses $ 6,279.48
Past loss of earnings 16,494.24
Pain, suffering and disability 33,750.00
 __________
 TOTAL $56,523.72

together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the expert witness fee of Gerald R. Litel, M.D., be fixed at $250 and taxed as costs.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that costs of court at the trial and appellate level be assessed 25% to plaintiff, AL L. MESHELL, and 75% to defendants, SAHID C. SHAMSIE and AUDUBON INSURANCE COMPANY.
AFFIRMED IN PART, AMENDED IN PART, AND RECAST AS AMENDED.