585 So.2d 1238 (1991)
Gertrude E. GRAY, et vir., Plaintiffs,
v.
LOUISIANA DOWNS, et al., Defendants.
No. 22638-CA.
Court of Appeal of Louisiana, Second Circuit.
August 21, 1991.
*1240 Roland V. McKneely, Jr., Bossier City, for plaintiffs-appellants.
Lunn, Irion, Johnson, Salley & Carlisle by Charles W. Salley, Shreveport, for defendants-appellees.
Before HIGHTOWER, VICTORY and BROWN, JJ.
HIGHTOWER, Judge.
This is an appeal from a judgment rejecting demands arising from a slip and fall accident at a thoroughbred racing track. We reverse, apportion fault, and award damages.

FACTS
On Thursday afternoon, November 3, 1988, Gertrude E. Gray ("plaintiff") and her husband attended the horse races at Louisiana Downs. The track is owned by Louisiana Downs, Inc., which operates all concession stands located inside the facility and is responsible for the maintenance and cleanup of the buildings and grounds. Another entity, Red River Downs, Inc., conducted the actual racing events on the date involved.[1]
On previous visits to the track, the Grays had normally sat in the enclosed grandstand; however, on this occasion they elected to sit in the outdoor spectator area. This open section of stands accommodated bleacher-type seating, along with benches, extending more than fifteen step-like tiers or rows downward from the grandstand toward the track. At various locations, metal banisters cordoned off a portion of the seating so as to form, in effect, a stairway leading from ground level to the top of the seating.
Mr. and Mrs. Gray, sitting near the top of the outdoor stands, did not bet frequently that day. In fact, plaintiff only went down to purchase parimutuel tickets before the seventh and eighth races. Returning to her seat after her second trip, she found her route obstructed by several patrons sitting or leaning against the handrail on the right side of the stairway. The presence of these spectators, which precluded utilization of the banister, caused her to traverse up the center of the steps. After detouring past the group, and while again reaching for the railing to her right, plaintiff glanced up toward her husband seated a few rows above. Before grasping the handrail, however, she suddenly slipped on a partially-eaten hot dog, causing her to fall and sustain injuries.
The Grays thereafter filed this action against both Louisiana Downs, Inc. and Red River Downs, Inc., generally claiming that the defendants' failure to properly inspect and maintain the premises resulted in plaintiff's fall. Following trial on the merits, the court concluded that:
In the grandstand area where there is constant traffic, it is not reasonable to expect Louisiana Downs to constantly sweep the area, keeping it swept free from any and all debris. At all sporting events people are constantly discarding empty containers and unwanted refreshments. This is a hazard that spectators must expect and be alerted to avoid.... [W]here food and other debris is (sic) being constantly thrown on the ground, it is not an unreasonable risk of harm.
Thus, concluding that the defendants breached no legal duty owed to Mrs. Gray, the trial court rendered judgment in favor of defendants. This appeal ensued.

NEGLIGENCE OF DEFENDANTS
It is well settled that the owner-operator of a public entertainment facility must use ordinary or reasonable care to maintain his premises in a reasonably safe condition considering the nature of his particular business. Spiers v. Lake Shore Enterprises, *1241 Inc., 210 So.2d 901 (La.App. 1st Cir.1968), and authorities there cited. See also Rosenberger v. Central La. Dist. Livestock Show, Inc., 312 So.2d 300 (La. 1975); Richoux v. Hebert, 449 So.2d 491 (La.App. 3d Cir.1983), writ denied, 450 So.2d 368 (La.1984). The degree of care required has even been said to be similar to that imposed upon a storekeeper as to his customers. Boucher v. Paramount-Richards Theatres, 30 So.2d 211 (La.App.1947). See also Gums v. Delta Downs, Inc., 425 So.2d 303 (La.App. 3d Cir.1982). The owner-operator of such premises is not, however, the insurer of the safety of his invitees. Richoux, supra; Boucher, supra.
Concerning the propensity of spectators at amusement facilities to discard their concession refuse on the ground, rather than in trash receptacles, at least one other jurisdiction has mentioned the problem, as did the trial court. The Alabama Supreme Court, in Gray v. Mobile Greyhound Park, Ltd., 370 So.2d 1384 (Ala. 1979), observed that:
At such places of public amusement as race tracks, dog tracks, ball parks, stadiums and the like, an accumulation of debris upon the walkways during the course of the event is not unlike the build-up of rain water on a storekeeper's floor during storms. In both cases, the accumulation may adversely affect foot traffica fact with which the invitee is or should be aware.
See also Perry v. Macon County Greyhound Park, 514 So.2d 1280 (Ala.1987). The Gray court further observed that, since a storekeeper is under no duty to take extraordinary care to keep his floors and passageways completely dry of tracked-in water, see also Johnson v. Tayco Foods, 475 So.2d 65 (La.App. 2d Cir. 1985), writ denied, 478 So.2d 149 (La.1985); Edwards v. Piggly Wiggly Operators, 401 So.2d 493 (La.App. 2d Cir.1981), so too would it be unreasonable to require the owner-operator of a public amusement facility to keep his walkways completely free of litter during the course of an amusement event. Of course, whether an owner-operator has discharged his duty of reasonable care is resolved on a case by case basis depending on the particular circumstances. Johnson, supra; Calhoun v. Royal Globe Ins. Co., 398 So.2d 1166 (La. App. 2d Cir.1981).
Mr. Nathan Pavy, director of building services for Louisiana Downs, Inc., advised that his employer sold concession food items, including hot dogs, which could be taken into the spectator area. Yet, at the time of plaintiff's fall, the track provided no trash receptacles for patrons seated outside, save one such device located a considerable distance away and down a tunnel at ground floor level. Acknowledging that patrons discarded food debris on the steps in the stands, Mr. Pavy further admitted having previously picked up observed refuse because it created "a hazard." Nonetheless, the facility assigned no employees to inspect and remove trash from this area during activities each day. Instead, the only cleanup occurred at the conclusion of the races after all spectators left.
Defendants' duty, to provide reasonably safe premises for the entertainment involved, encompasses the risk of a patron slipping and falling on concession litter when other persons or activity momentarily attracts his or her attention. Although the director of building services knew of only two other reported falls, he acknowledged that the litter in the spectator area constituted a hazard. Despite that knowledge, the track provided no additional trash disposal means or clean-up procedures, nor implemented measures designed to keep stairways and walkways clear for persons to access the banisters for their safety. The failure to exercise such reasonable care constituted a breach of the duty owed by defendants to plaintiff as an invitee of the racetrack. And, in arriving at a contrary conclusion, the district court clearly erred.

CONTRIBUTORY NEGLIGENCE OF PLAINTIFF
An objective, reasonable man standard controls in viewing plaintiff's conduct and assessing any contributory negligence; the query: what would a reasonable *1242 man do under like circumstances for his own safety and protection? Baugh v. Redmond, 565 So.2d 953 (La.App. 2d Cir. 1990); Lee v. Great Southwest Fire Ins. Co., 493 So.2d 789 (La.App. 2d Cir.1986). Upon a finding of contributory negligence, LSA-C.C. Art. 2323 reduces the claim of a plaintiff in proportion to his degree of fault. The apportionment of fault, a factual matter, will not be disturbed on review unless clearly wrong. Soileau v. South Central Bell Telephone Co., 406 So.2d 182 (La.1981); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Of course, the trial court failed to reach any such determination in the present case.
During her trips to the parimutuel window, plaintiff claimed that she observed chicken bones, pieces of pizza, paper cups and other litter "all over" the facility, including the steps. In fact, she admitted walking in some of the food prior to her fall. As she approached the stairway, approximately fifteen minutes remained before the start of the next race. Although not rushed, she chose to walk up the center of the stairway rather than wait until several patrons, approaching on the left side, passed and afforded access to the left railing. Having placed herself where she could not reach a handrail, and knowing of the clutter present, she nonetheless averted her attention to her husband and thereby failed to see the hot dog in question.
A person, while not required to exercise the utmost caution at each moment to avoid every hazard, Soileau, supra, has a duty to see and avoid obvious hazards. See Weber v. Buccola-McKenzie, Inc., 541 So.2d 315 (La.App. 5th Cir.1989); Meshell v. Shamsie, 528 So.2d 1023 (La.App. 3d Cir.1988). Plaintiff's failure to exercise ordinary care for her own safety, under the instant facts, clearly constituted contributory negligence.

APPORTIONMENT OF NEGLIGENCE
In allocating comparative fault, consideration must be given to the nature of each party's conduct and the extent of the causal relationship between the conduct and the damages claimed. Some of the factors, which may influence the degree of fault assigned to parties, are: 1) whether the conduct resulted from inadvertence or involved an awareness of the danger, 2) how great a risk was created by the conduct, 3) the significance of what was sought by the conduct, 4) the capacities of the actor, whether superior or inferior, and 5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985); Baugh, supra; Lee, supra.
The total absence of reasonable inspection and cleanup procedures, coupled with a failure to prevent patrons from congregating in the stairway, thereby depriving others of access to the handrails, stands as a cause of plaintiff's harm. However, plaintiff successfully traversed this same route on at least three occasions within a couple of hours before her fall, actually stepping on food clutter while doing so. Knowing of the littered condition of the stands, she nonetheless diverted her attention from the steps at a time when she lacked the aid of a supporting banister. But for that inattentiveness, she could have avoided the hot dog.
There is no precise formula for allocating fault under LSA-C.C. Art. 2323, and even with the application of the guidelines delineated above, apportionment will always be "somewhat inexact." See Watson, supra at 973 n. 15. Lacking a specific test, members of a reviewing court will occasionally find themselves in disagreement as to the degree of fault assessed to the various parties. See, e.g., Finley v. North Assur. Co. of Am., 476 So.2d 837 (La.App. 2d Cir.1985); Thissel v. Comm. Union Ins. Co., 476 So.2d 851 (La.App. 2d Cir.1985), writs denied, 479 So.2d 361, 366 (La.1985); Frosch v. Nat'l. Tea Co., 539 So.2d 640 (La.App. 4th Cir.1988); Quinn v. State, Through Dept. of Highways, 464 So.2d 357 (La.App. 3d Cir.1985), writs denied, 467 So.2d 1134, 1136 (La.1985). Such has occurred here.
The majority of this appellate panel, concluding that plaintiff's negligent inattentiveness *1243 is slight in comparison to defendants' failure to make the premises reasonably safe for patrons, apportions fault seventy-five percent to defendants, in solido, and twenty-five percent to plaintiff. That determination, of course, will control the judgment to be rendered. On the other hand, after similarly considering the duties and actions of the parties, the author of this opinion must respectfully disagree. In my personal view, responsibility for the injury should instead be assessed at forty-five percent to plaintiff and fifty-five percent to defendants, in solido. See Weber, supra.

DAMAGES
In 1973, plaintiff sustained injuries in an automobile accident necessitating, first, a lumbar diskectomy and, later, a spinal fusion. While the latter procedure, performed in 1980, provided some relief, plaintiff testified that she continued to endure pain in the center of her low back. The resultant disability prevented her from doing numerous household chores, lifting anything heavier than a carton of eggs or loaf of bread, or returning to employment outside the home. Indeed, plaintiff received social security disability benefits for approximately eight years before her fall at the racetrack. Despite continuing problems with her back, plaintiff claimed she sought no further medical treatment for her complaints after 1980, simply relying instead on a heating pad and topical analgesics when her back hurt "real bad," and also daily administrations of aspirin.
On April 25, 1988, approximately seven months before the accident at issue, Dr. J.E. Smith reevaluated plaintiff's condition at the request of the Office of Social Security. At that time, he noted her complaints of "a great deal of pain" in her back, primarily on the right side, radiating down the right leg and foot. Physical examination revealed a positive straight leg raising test on the right, decreased range of motion of the lumbar spine, decreased sensation over her S-1 distribution, and no reflex in the right ankle. Observing an unstable back and lumbar disc disease, Dr. Smith recommended continued disability benefits.
Plaintiff, age 48 at that time, did not again consult a physician concerning her back until three days after her fall. Then, complaining of pain in her lower back and pelvic area, she reported to the emergency room of Willis Knighton Hospital, where she saw Dr. James Lillich, an orthopedic specialist. Initial examination yielded a diagnosis of acute lumbosacral strain, for which the doctor recommended bed rest and mild pain medication. During follow-up office visits, he noted her complaints of tenderness over the lower lumbar vertebra, right S-1 joint, and paraspinous muscles. On her third visit, she described numbness and tingling in her right hip which occasionally radiated into her leg. Dr. Lillich could not, however, find evidence of nerve impingement. Considering her symptoms, he felt that conservative treatment would likely return her to normal activities within six weeks of the injury.
Plaintiff's subsequent, continued complaints prompted an MRI and EMG. Both studies, however, proved negative. On July 28, 1989, Dr. Lillich referred her to his partner, Dr. Austin Gleason, whose initial examination rendered several findings consistent with Dr. Smith's 1988 report. Furthermore, Dr. Gleason, an orthopedist, could find no objective evidence contraverting Dr. Lillich's assessment that plaintiff should have been able to return to her normal activities within six weeks after her injury. In fact, her response to one of the neurological exams indicated possible feigning of weakness on her part.
Dr. Gleason thereafter saw plaintiff on five other occasions during August, September, and October of 1989. She reported substantial relief through physical therapy during this time, and the physician noted that her condition continued to improve. Two final office visits transpired in March and April of 1990, following a car trip which exacerbated her pain. Dr. Gleason agreed, however, that such complaints could have occurred even without the present mishap.
Stating an impression that plaintiff probably suffered a twenty percent disability as *1244 a result of her pre-existing condition, Dr. Gleason enhanced this rating by "perhaps five percent," basing that assessment solely on her complaints of low back pain. Also, although foreseeing that Mrs. Gray would probably need intermittent care for the remainder of her life, the doctor felt such expenses could have been required even without the factor of her 1988 accident.
Dr. Carl Goodman, a third orthopedic surgeon, who examined plaintiff at the request of defendants, found she suffered a lumbar strain and sprain. His examination disclosed the same objective symptoms as Dr. Smith had described. Agreeing plaintiff would need occasional future therapy, Dr. Goodman could not delineate whether such attention would be necessitated by the pre-existing condition or aggravation caused by the fall. However, in his report, he opined that "a lot of her back problems are related to her previous disc disease and spinal fusion with increased stress at the levels above her previous fusion." He also assigned, consistent with Dr. Gleason's assessment, an additional disability rating of "say five percent" as a result of the accident.
Plaintiff testified that, after the incident, she found it necessary to reduce her leisure activities and household responsibilities. Yet neither of the testifying doctors indicated that her additional disability gave rise to increased physical restrictions. Rather, according to the physicians, much of plaintiff's anticipated future complaints will result from an accelerated aging process induced by her previous surgeries.
In making an initial award of damages at the appellate level, we are not limited to either the highest or lowest amount which could be affirmed. Instead, based upon the record, we determine an award which would be just. Lee v. Great Southwest Fire Ins. Co., supra; Wall v. Am. Empl. Ins. Co., 377 So.2d 369 (La. App. 2d Cir.1979), aff'd, 386 So.2d 79 (La. 1980).
From our review of this record, we conclude plaintiff suffered a lumbosacral strain-sprain, which exacerbated the chronic pain she already endured as a result of pre-existing degenerative disc disease and the spinal fusion. Although the doctors slightly increased her disability rating, no objective evidence enhanced her pre-existing physical limitations. Considering the circumstances of this case, we conclude that an award of $20,000 will adequately compensate Mrs. Gray for her pain, suffering, and slight additional disability. Compare Raymond v. Safeway Stores, Inc., 522 So.2d 1350 (La.App. 2d Cir.1988); Lindsay v. Toys, 499 So.2d 462 (La.App. 2d Cir.1986); Harper v. Boudreaux, 496 So.2d 439 (La.App. 1st Cir.1986); Rosemond v. Diggs, 468 So.2d 652 (La.App. 4th Cir.1985).
An award for medical expenses must be established with some degree of certainty, and the plaintiff must demonstrate that the expenses more probably than not will be incurred. Crowther v. Kmart Corp., 568 So.2d 669 (La.App. 4th Cir.1990), writ denied, 571 So.2d 656 (La. 1990). Neither Dr. Gleason nor Dr. Goodman could state that plaintiff would need future medical care as a result of the injury she sustained in her fall. Instead, the greater likelihood appears to be that such treatment will result from flareups caused by arthritis and her pre-existing degenerative disc disease. Accordingly, the possibility of future medical care necessitated as a result of this injury is too speculative to justify an award. She is, however, entitled to the proven medical expenses of $5,344.96.
Finally, Mr. Gray seeks an award for his loss of consortium. Compensable elements in such a claim are loss of love and affection, society and companionship, sexual relations, performance of material services, right of support, aid and assistance, and felicity. Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985).
Mr. Gray testified that, for about a week following the fall, he had to assist his wife in rolling over in the bed and walking. Although claiming he now has to do all of the household chores, he also inconsistently stated that no real change had occurred in his wife's activities around the house. He *1245 further asserted that, prior to the accident, he and plaintiff spent all of their free time together, enjoying pastimes such as fishing, camping and metal detecting. Declaring they no longer engage in these activities, he nevertheless acknowledged that they still have a close relationship, doing everything together, especially since his retirement. Finally, Mr. Gray claimed that their sexual relations had suffered. Nonetheless, Mr. Gray admitted he loved his wife just as much as he ever had.
Considering the evidence presented, we determine that an award of $3,000 will sufficiently compensate Mr. Gray for his loss. Compare Cascio v. City of Monroe, 530 So.2d 1170 (La.App. 2d Cir.1988). Of course, this amount is also subject to reduction by the percentage of negligence attributable to his wife. Cascio, supra.

CONCLUSION
For the foregoing reasons, the judgment of the trial court finding no liability on the part of defendants is reversed. Judgment is now rendered as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Gertrude E. Gray and against Louisiana Downs, Inc. and Red River Downs, Inc., in solido, in the amount of $25,344.96, together with legal interest thereon from date of judicial demand until paid, subject to a reduction of twenty-five percent.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of William T. Gray and against Louisiana Downs, Inc. and Red River Downs, Inc., in solido, in the amount of $3,000, together with legal interest thereon from date of judicial demand until paid, subject to a reduction of twenty-five percent.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that costs of court at the trial and appellate level be assessed twenty-five percent to plaintiffs, Gertrude E. Gray and William T. Gray, and seventy-five percent to defendants, Louisiana Downs, Inc. and Red River Downs, Inc.
REVERSED AND RENDERED.
BROWN, J., concurs with reasons.
BROWN, Judge, concurring.
I concur in the reversal of the trial court and the apportionment of negligence in the amount of 75 percent to defendants. I concur in the damage award although I believe it to be on the low side.
I strongly disagree with the assessment of any cost of court to plaintiff. In this case plaintiff appealed seeking a reversal of the trial court's ruling on liability and requested an apportionment of fault and the setting of damages. Plaintiff received exactly the relief sought in this court. Under these circumstances and in accordance with prior rulings by this court, defendants should be assessed with all costs of court. Morris v. Owens Illinois, et al, 582 So.2d 1349 (La.App. 2d Cir.1991).
NOTES
[1] In answers to interrogatories filed in evidence, Red River Downs, Inc., also acknowledged an obligation, pursuant to its lease agreement, to keep the premises cleaned.