639 So.2d 805 (1994)
Georgia R. SLEDGE, Individually and as Tutrix of her Minor Daughter, Catherine Leigh Sledge, Plaintiff-Appellant-Appellee,
v.
CONTINENTAL CASUALTY CO., et al., Defendants-Appellants-Appellees.
No. 25,770-CA.
Court of Appeal of Louisiana, Second Circuit.
June 24, 1994.
*809 John A. Boatner, Bunkie, for Georgia R. Sledge.
Mayer, Smith & Roberts by David F. Butterfield, Shreveport, for Continental Cas. Co.
Bodenheimer, Jones, Klotz & Simmons by G.M. Bodenheimer, Shreveport, for Cas. Reciprocal Exchange, et al.
Voorhies and Labbe by Cyd Sheree Page, Lafayette, for Jane Sledge.
Before LINDSAY, HIGHTOWER and VICTORY, JJ.
HIGHTOWER, Judge.
This is a suit instituted by a mother, individually and on behalf of her minor daughter, following a one-vehicle accident in which the child sustained personal injuries and the girl's father died. After the trial judge resolved insurance coverage questions in favor of plaintiffs and a jury decided the factual issues, various litigants appealed. For the reasons hereinafter expressed, we amend the judgment and affirm as amended.

BACKGROUND
In early June 1990, Randolph Sledge ("Sledge")[1] took his two minor children, Leigh Sledge and James Sledge, two of their friends, and his nephew to the Louisiana State Bar Convention in Destin, Florida for a vacation. To facilitate the trip from Louisiana, Sledge acted through an intermediary, Daniel Scott Brown, a friend of the family, to borrow a Ford Econoline van owned by Dr. Joseph Beard of Shreveport. Although the owner mistakenly believed that the vehicle would only be driven to a nearby location in Arkansas, Sledge had no contact with the owner and allowed Brown to conduct all the arrangements.
After several days in Florida, the vacationers departed for home at approximately 10:30 p.m. on June 9, with Sledge driving. During the return trip, everyone except the driver and his son slept. Finally, about 2:00 or 2:30 a.m., the youth also fell asleep. Later, around 3:00 a.m., Sledge felt tired and asked his 15-year-old son if he could take over the driving chores. Proud that his father had confidence in his abilities, the recently-licensed teenager agreed. Sledge then reclined in the front passenger seat and went to sleep.
Shortly after James began driving, he fell asleep at the wheel, allowing the van to leave the highway in Stone County, Mississippi, continue over a steep embankment and collide with a tree. The resultant impact caused the immediate death of Sledge and *810 seriously injured all other occupants, with those sustained by James apparently being the most significant.
Treatment of Leigh, 11 years old at the time of the accident, required two months in the hospital and another month with her leg in a cast, followed by a period on crutches and undergoing physical therapy. Nevertheless, within seven months, the young girl had fully recovered and resumed her normal activities.
Georgia R. Sledge, individually and as tutrix of her daughter, filed suit alleging that the accident resulted solely from the fault of James, and asserting the father's vicarious liability for the negligence of his minor son. Plaintiffs sued Continental Casualty Company ("Continental"), the insurer of Dr. Beard's van; Casualty Reciprocal Exchange ("Reciprocal"), Sledge's automobile insurance carrier; the Succession of Randolph Sledge; and Jane Lefebvre Sledge, the tutrix of James. The petition sought recovery for Leigh's personal injuries and the wrongful death of her father, along with her mother's incurred medical bills, lost wages, and loss of society with the child.
Eventually, the parties agreed to bifurcate the insurance coverage questions from the remaining issues of the case. Then, based upon an evidentiary stipulation, the trial court rendered a "judgment" declaring James and his father to be insureds under Continental's policy.
After a four-day trial concerning the other aspects, the jury's special verdict reported the following findings:

1) Fault in causing the accident:
 James Sledge 50%
 Randolph Sledge 50%
2) Damages for Leigh Sledge's Personal Injuries:
 Past and future pain and suffering$ 60,000.00
 Past and future mental pain
 and suffering $ 40,000.00
3) Damages for Wrongful Death:
 Loss of love, affection and
 society $247,815.00
 Loss of past and future support $ 50,000.00
 One-half of funeral expenses $ 2,185.00
4) Georgia Sledge's Damages resulting from accident:
 Loss of society $ 3,000.00
 Medical expenses $ 31,878.21
 Lost wages $ 5,726.99

Subsequently, the district judge reduced the wrongful death recovery by fifty percent, while awarding total damages with respect to the other claims.
Three separate appeals ensued with plaintiffs, Continental, and Jane Lefebvre Sledge asserting numerous assignments of error. The succession and Reciprocal did not appeal, filing instead only a short brief adopting plaintiffs' arguments on the insurance coverage issues.

DISCUSSION

INSURANCE COVERAGE
In its first two assignments of error, Continental complains that the trial court erred in declaring that the insurer's "Universal Security Policy: Elite,"[2] previously issued to Dr. Beard, afforded liability coverage to both James and Sledge. It is argued that, under the factual circumstances involved, two separate provisions of the insurance contract precluded its applicability.

Validity of Appeal
Before examining these arguments, however, we must resolve whether the coverage question has been properly preserved. As noted, the parties litigated the insurance issue separately in accordance with LSA-C.C.P. Art. 1562(D). After its decision, but before the jury trial, the district court granted Continental's motion for "devolutive appeal or the alternatively requested application for supervisory writs." Yet, save the current appeal, the record reveals no other disposition of the matter beyond an extension of time for completing transcriptions.[3] In oral argument, plaintiffs maintain *811 that the first appeal has been abandoned, making the coverage determination final.
Appeals may be taken from "a final judgment" or "an interlocutory judgment which may cause irreparable injury." LSA-C.C.P. Art. 2083. A final judgment is one that determines the merits of the action in whole or in part. LSA-C.C.P. Art. 1841. Further, an exclusive listing of those instances where partial final judgements may be rendered and appealed is provided by LSA-C.C.P. Art. 1915. Everything on Wheels Subaru, Inc. v. Subaru South, Inc., 616 So.2d 1234 (La.1993). The earlier coverage decision here, given that it neither causes irreparable harm nor is expressly reviewable under LSA-C.C.P. Art. 1915, constitutes merely an interlocutory judgment presentable for appellate consideration via application for supervisory writs or appeal following adjudication of the remaining issues. Id. Consequently, the coverage dispute continues to be viable, notwithstanding that Continental admittedly abandoned any effort toward supervisory review.

Reasonable Belief Clause
In first contending that James is not a "covered person" under Beard's insurance policy, Continental points to a crucial portion of the contract providing coverage to "[a]ny other person using or occupying your motor vehicle or boat, if there is a reasonable belief that person was permitted to use it." The insurer maintains the trial court erred in finding that the 15-year-old reasonably believed he had permission to drive the vehicle under the circumstances. This argument is unconvincing, however.
Clauses similar to the one relied upon by Continental have been very broadly construed in favor of permission. Francois v. Ybarzabal, 483 So.2d 602 (La.1986); Williams v. Buckelew, 246 So.2d 58 (La. App.2d Cir.1971); Johnson v. Aetna Casualty and Surety Co., 274 So.2d 769 (La.App. 3d Cir.1973). The requirement of "reasonable belief" sets forth
a subjective standard of determining permission, so that a permittee could be covered if he reasonably believed that he had permission of the owner, transmitted through another permittee, whether or not such other permittee had actual authority to transmit permission.
Johnson, supra, at 773. See also Brumfield v. United Services Auto. Assoc., 616 So.2d 876 (La.App. 3d Cir.1993); Building Specialties, Inc. v. State Farm Mutual Auto. Ins. Co., 440 So.2d 984 (La.App. 3d Cir.1983). Such phraseology provides a criterion based on the driver's expectations. Hence, trial court findings of fact in this regard should not be set aside unless clearly wrong or manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Continental's primary position centers around a paraphrasing of LSA-R.S. 32:416.1 contained on the reverse side of James's driving license and reading, "MinorsIllegal For Anyone Under 17 to Drive Between 11 P.M.-5 A.M. Mon.-Thurs. and Between 12 A.M.-5 A.M. Fri.Sun." The insurer argues that this restriction prevented the 15-year-old from "reasonably believing" he could lawfully operate the van at 3:00 a.m. on a Mississippi highway, even though that state directly places no similar constraint on its drivers. Yet the teenager's testimony indicated that, although he knew of the Louisiana limitation, he had no knowledge about the law in other states. To resolve that aspect, James said he relied on his father, a district judge. The youngster reasoned that, had it been illegal, no request would have been made for him to drive.
Continental further contends James could not possibly believe that Beard, an adult he did not know, would have authorized him to drive. The insurer notes testimony by the van owner stating that he did not allow teenagers, even his own, to use the vehicle. However, as indicated, the issue of permission should be viewed from the driver's perspective. In that neither Brown nor Beard announced any restrictions, we fail to understand how the borrowing party's son could be expected to assume that specific rules or conditions existed. Nor should it be disregarded that the young man had driven the van several times earlier in the week, including once at night.
*812 Simply stated, we find no error in the trial court's conclusion that the minor reasonably believed he had permission to use the van.

"Violation of Law" Exclusion
In a second assignment of error, Continental contends that the trial court erred in failing to find the actions of both James and Sledge specifically excluded by a policy provision stating:
We do not provide [liability] coverage for:
1. Personal Injury, bodily injury or property damage arising out of:
a. An act committed in violation of a law or ordinance by, or with the knowledge or the expressed or implied consent of a covered person[.]
Again relying on LSA-R.S. 32:416.1, the insurer contends the teenager violated both Mississippi and Louisiana law by driving during the prohibited hours, and that his father concurred in that violation. Nonetheless, deeming this provision inapplicable to the present circumstances, we do not address the correctness of the district court ruling that Mississippi law controls and, thus, no statutory violation occurred.
Insurance policies should be generally construed to effect, not deny, coverage. Yount v. Maisano, 627 So.2d 148 (La.1993). The contract should be given a sensible interpretation compatible with the design and intent of the parties, and any ambiguity in an exclusion should be construed against the insurer. Id.; Thomas v. First National Life Ins. Co., 250 So.2d 42 (La.App. 3d Cir.1971); see also LSA-C.C. Art. 2045. Nor is an insurer at liberty to limit its liability and impose conditions upon its obligations in conflict with statutory law or public policy. Block v. Reliance Ins. Co., 433 So.2d 1040 (La.1983).
To read "an act ... in violation of a law or ordinance" to encompass all breaches of the Highway Regulatory Act, LSA-R.S. 32:1 et seq., would do considerable violence to the obvious intent of the parties to the insurance contract before us, and, in the process, reduce indemnity to a mere facade. Cf. Thomas v. First National Life, supra. Literally construed, the language in question would effectively deny coverage for all acts incidentally and technically constituting an infraction of the statutory "rules of the road" or other regulatory provisions. Most assuredly today, as observed by then-Judge Cardozo in Messersmith v. American Fidelity Co., 232 N.Y. 161, 133 N.E. 432 (1921), and discussed later in Bowman v. Preferred Risk Mutual Ins. Co., 348 Mich. 531, 83 N.W.2d 434 (1957), behavior modifying statutes, particularly highway enactments, permeate the spectrum of the law so extensively that liability seldom arises apart from some manner of illegal conduct.
Yet, understandably, a policyholder would normally not expect the instant exclusion to control in reference to speeding, running a stop sign, or failing to maintain control. Cf. Bowman, supra (finding such an exclusion inapplicable concerning a technical violation of the law); Graham v. James F. Jackson Associates, Inc., 84 N.C.App. 427, 352 S.E.2d 878 (1987) (refusing to apply a similar exclusion to claims following an involuntary manslaughter conviction).
Further, Continental's interpretation clearly conflicts with Louisiana's public policy that liability insurance should protect innocent accident victims. See, e.g., Direct Action Statute, LSA-R.S. 22:655; Compulsory Liability Insurance Law, LSA-R.S. 32:861, et seq.; Financial Responsibility Law, LSA-R.S. 32:891, et seq.; Norton v. Lewis, 623 So.2d 874 (La.1993); White v. State, Dept. of Public Safety, 569 So.2d 1001 (La.App. 1st Cir.1990). See also Progressive Preferred Ins. Co. v. Williams, 864 F.2d 110 (11th Cir.1989) (observing that an unlicensed or underage driver preclusion may be unenforceable against innocent victims). On the other hand, neither can we ignore the competing policy consideration that wrongdoers should not be allowed to indemnify themselves against their own criminal acts. See Graham Resources v. Lexington, Ins. Co., 625 So.2d 716, 721 (La.App. 1st Cir.1993); 1 Couch on Insurance 2d § 1:39 (Rev. ed. 1984). Even so, the cases cited by Continental, all dealing with intentional tort exclusions, do not authorize the broad elimination of liability coverage for all violations of statutory regulations.
Instead, we appreciate the present exclusion to concern only those "acts in violation *813 of law" which are criminal in nature and normally require specific or general intent as delineated in LSA-R.S. 14:10 and 14:11, or equivalent offenses. Cf. Applewhite v. City of Baton Rouge, 380 So.2d 119 (La.App. 1st Cir.1979) (validating an exclusion in a general liability policy directed at "the willful violation of a penal statute"); Van Riper v. Constitutional Government League, 1 Wash.2d 635, 96 P.2d 588 (1939) ("violation of law" exclusion in life insurance policy applied only to criminal acts of a serious nature). In our view, such an interpretation recognizes the insured's reasonable expectations of coverage, while voiding the exclusion only to the extent of its contravention of public policy. In the present case then, even assuming that the teenager's early morning driving violated Mississippi law, the resulting infraction would not have required criminal intent. See Miss.Code Ann. §§ 63-1-5; 63-1-7. Under these circumstances, therefore, the exclusion is inapplicable.

APPORTIONMENT OF FAULT
All of the appealing parties contend the jury erred in its apportionment of fault between the son and his father. Plaintiffs, in one assignment, contend Sledge's negligence should be eliminated entirely or at least reduced, while Continental and Jane Lefebvre Sledge would increase the percentage attributable to him. None of these contentions, however, bear merit.
Because an objective, reasonable man standard controls in viewing conduct which may constitute negligence, the query presented is: What would a reasonable man do under like circumstances? See Gray v. Louisiana Downs, 585 So.2d 1238 (La.App. 2d Cir.1991), and authorities therein. The apportionment of fault constitutes a factual finding and thus will not be disturbed unless demonstrated to be clearly wrong. Starnes v. Caddo Parish School Board, 598 So.2d 472 (La.App. 2d Cir.1992); Clark v. Ark-La-Tex Auction, Inc., 593 So.2d 870 (La.App. 2d Cir.1992), writ denied, 596 So.2d 210 (La. 1992); Gray, supra. In the present case, before reviewing the allocation between the two parties, we must determine whether the jury should have assessed any fault to Sledge.
Although a passenger ordinarily has no duty to supervise a driver, fault may be imposed where there is a joint venture, an independent negligent act by the passenger, or a showing that the rider had actual or constructive knowledge of a driver's incompetence or impaired ability to operate the vehicle. Adams v. Security Ins. Co. of Hartford, 543 So.2d 480 (La.1989); Nowell v. State Farm Auto. Ins. Co., 576 So.2d 77 (La.App. 2d Cir.1991), writ denied, 580 So.2d 923 (La.1991); Daugherty v. Casualty Reciprocal Exchange Ins. Co., 522 So.2d 1323 (La. App. 2d Cir.1988). Our review of the record reveals ample evidence from which the jury could find Sledge partially negligent in causing the accident.
The father woke his son at about 3:00 a.m., after James had been sleeping for no more than an hour and while the other occupants of the vehicle continued to sleep. Several witnesses confirmed that, during their vacation, the three teenage boys nightly stayed on the beach while drinking beer into the early morning hours, and on at least one occasion actually remained out the entire night. Based on the evidence, Sledge surely knew of these activities. Additionally, the young men slept on a sofa and air mattresses on the floor at the Florida condominium, getting only about five hours of rest per night, while the group's sole adult retired to his own bedroom. These factors, along with Sledge's deliberate decision to travel at night, could have led the jury to conclude he acted negligently in asking his child to drive. Other apparent options included stopping for a short nap, rolling down a window and turning on the radio, or driving to the nearest motel.
Clearly, the present factual situation distinguishes itself from those cases cited by plaintiff. See, e.g., Coleman v. Argonaut Ins. Co., 187 So.2d 495 (La.App. 3d Cir.1966) (rejecting the notion that a mother could be negligent exclusively on a theory that she owed a special duty, as parent, to supervise her son's driving). Cf. Moore v. Chrysler Corp., 596 So.2d 225 (La.App. 2d Cir.1992), and Loveday v. Travelers Ins. Co., 585 So.2d *814 597 (La.App. 3d Cir.1991) (refusing to predicate negligence solely upon the fact that an adult or parent allowed an inexperienced, young, or unlicensed teenager to drive). Here, beyond soliciting his recently-licensed son to drive the van during the early morning, Sledge knew that the youngster had kept late hours throughout their vacation. Similarly, he should have recognized that the boy, notwithstanding any physical exhaustion on his part, would be unlikely to refuse his father's request. Yet, despite all this, Sledge still reclined his seat and went to sleep after about five or ten minutes. As viewed by the jury, and likewise in our evaluation, the circumstances at hand support a conclusion that the actions of the passenger significantly contributed to the accident. Cf. Bufkin v. Mid-America Indem. Co., 528 So.2d 589 (La.App. 2d Cir.1988); Daugherty, supra.; Snyder v. Bergeron, 501 So.2d 291 (La.App. 1st Cir.1987), writ denied, 503 So.2d 483 (La.1987); Gravois v. Succ. of Trauth, 498 So.2d 140 (La.App. 5th Cir.1986), writ denied, 500 So.2d 422 (La.1987).
Nor, in next reviewing the percentages of fault, do we discover any manifest error. For a detailed discussion of the factors to be considered in determining relative allocations of negligence, see Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985). Upon assuming the driving chores, James had a duty to maintain control of the vehicle but clearly breached that responsibility by permitting the van to run off the roadway. Furthermore, in his desire to help his father get the group home, the teenager failed to consider his late night "beach partying" and lack of sleep. Similarly, the young driver testified that, on the day of their departure, the three boys had stayed on the beach all day and "lived it up as much as [they] could." In light of these circumstances and the previously-mentioned actions of Sledge, the jury did not err in apportioning fault, fifty percent each, to the father and son.

JURY INSTRUCTIONS
Defendant Jane Lefebvre Sledge contends the trial judge incorrectly charged the jury on the allocation of fault, as well as the duties of a guest passenger.[4] Nonetheless, our review reveals she failed to make a timely objection on the record.
LSA-C.C.P. Art. 1793(C) states:
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. [Emphasis added].
In the case at hand, until the jury returned with a question approximately twenty minutes after deliberations began, none of the attorneys had complained about the final draft of the charge. The foreperson, upon his reappearance, inquired as to how much Leigh would be awarded if jurors found James forty percent negligent. In response, the trial judge reread the special verdict form, noting the language therein that the court would determine the exact recovery amounts according to the allocations of fault, and that the jury should not concern itself with such calculations. Thereafter, upon the jury panel again retiring to its deliberations, the attorney for Jane Lefebvre Sledge stated her objections.
Although she contends that a degree of confusion existed regarding the finality of the last draft of instructions submitted to the parties in chambers, this does not excuse the failure to voice, earlier than transpired here, any objection to the charge. While apparently no appellate decision has addressed the "immediately after" language added to LSA-C.C.P. Art. 1793(C) by amendment in 1987 (Act No. 699 § 1), we conclude that an attorney must, on the record, present any objection *815 to the charge as soon as the jury has left the courtroom to begin its initial deliberations and without any undue delay.[5] This short interval, while not mandating instantaneous protest, affords the trial judge an opportunity to correct any problems before jurors extensively contemplate the case and possibly undergo further influence through their discussions. In that defendant's delayed complaint does not comply with that requirement, her objection is considered waived. See Trans-Global Alloy Ltd. v. First Nat. Bank of Jeff. Parish, 583 So.2d 443 (La.1991); Smiciklas v. Groendyke Transport, Inc., 505 So.2d 775 (La.App. 2d Cir.1987), writ denied, 506 So.2d 1231 (La. 1987).
Moreover, the assignment lacks merit. In light of our previous discussion regarding the jury's fault allocations and the law governing passengers, we fail to find that the instructions created any prejudice to this defendant's case. For a discussion of the principles applicable to the review of jury charges, see Futrell v. Scott Truck and Tractor Co., 629 So.2d 449 (La.App. 3d Cir.1993); Engolia v. Allain, 625 So.2d 723 (La.App. 1st Cir. 1993); Mitchell v. Fire & Cas. Ins. Co. of Conn., 540 So.2d 352 (La.App. 1st Cir.1989), writ denied, 541 So.2d 1390 (La.1989).

QUANTUM
Regarding the assessments of damages, the appealing parties all dispute particular portions of the judgment. Plaintiffs contend the jury erred in awarding Leigh only $50,000 in loss of support. The other two appellants, Continental and Jane Lefebvre Sledge, challenge both the $300,000 wrongful death and $100,000 personal injury sums as excessive.
In assessing damages in cases of offenses, quasi-offenses, and quasi-contracts, much discretion must be left to the judge or jury. LSA-C.C. Art. 2324.1. Before an appellate court may disturb such an award, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993); Reck v. Stevens, 373 So.2d 498 (La.1979); Brimer v. Copeland, 604 So.2d 1388 (La.App. 2d Cir. 1992). In determining whether the trier of fact abused discretion by making an excessive award, the evidence must be viewed in the light most favorable to the plaintiff, whereas an inadequate award is viewed in the light most favorable to the defendant. Higginbotham v. Ouachita Parish Police Jury, 513 So.2d 537 (La.App. 2d Cir.1987). Of course, upon finding an award is, in either direction, beyond that which a reasonable trier of fact could assess, the reviewing court may lower (or increase) an award of general damages to the highest (or lowest) amount that could appropriately be granted. Youn, supra; Brimer, supra. However, it is only after an articulated factual analysis discloses such abuse that guidance from prior awards becomes relevant. Youn, supra; Reck, supra; Thomas v. Petrolane Gas Service, Ltd., 588 So.2d 711 (La.App. 2d Cir.1991), writ denied, 590 So.2d 1201 (La.1992).

Wrongful Death: Loss of Support
As indicated, plaintiffs claim the jury manifestly erred in awarding Leigh only $50,000 for the loss of support element of her wrongful death demand. They maintain that the fact-trier ignored the testimony of their economist, Dr. Jan Warren Drugger. We find no abuse of discretion, however.
Awards for lost future income, or support, are intrinsically insusceptible of calculation with mathematical certainty. Instead, the courts must exercise sound judicial discretion in determining if such awards are consistent with the record and do not work a hardship upon either party. Higginbotham, supra. Speculation, probabilities, and conjecture cannot form the basis of the loss, which must be shown with reasonable certainty. Thomas v. State Farm Ins. Co., 499 So.2d 562 (La.App. 2d Cir.1986), writs denied, 501 So.2d 213, 215 (La.1987). Of course, the effect and weight to be given expert testimony depends upon the facts underlying *816 the opinion and, also, rests within the broad discretion of the trier of fact. Middle Tenn. Council, Inc. v. Ford, 274 So.2d 173 (La.1973); Winford Co., Inc. v. Webster Gravel and Asphalt, Inc., 571 So.2d 802 (La.App. 2d Cir.1990).
The record reflects a variety of evidence on the issue of support. Sledge, pursuant to a 1986 court order, had been paying $400 per month child support. He also provided Leigh with gifts on her birthday and holidays, clothes and other items when needed, and additional allowances of cash. Payroll records indicated he earned approximately $68,000 per year from 1985 to 1989, and had recently received a raise which would have gradually increased his salary from $73,776.72 to $84,600 between 1990 and 1992. Finally, testimony revealed his substantial election campaign debts, a factor considered in the original judicial determination of child support.
Using only payroll data, plaintiffs' expert computed Leigh's loss of support to be between $118,328 and $119,391. The first sum began with a computation of Sledge's potential monthly obligation under the Louisiana Guidelines for Child Support, LSA-R.S. 9:315 et seq., then projected that figure from the date of the accident until Leigh possibly finished four years of college, and finally added $40,000 as the average cost of a college education. The economist based his assumptions on statements by Georgia that she intended to pursue increased support due to the recent pay raises, and Leigh's indications that her father wanted her to attend college. For the second total ($119,391), the economist relied upon U.S. Department of Agriculture data found in various governmental studies and reporting the cost for high income families to rear a child.
On cross examination, defendants brought out the speculative nature of the two figures presented by Dr. Drugger. Of particular consequence, they noted that Georgia Sledge had not, at the time of the accident, sought to increase child support and that Sledge faced an impending re-election campaign with potential additional debts. When asked to use his same calculations to project the existing $400 award through four years of college, the economist arrived at a figure of $40,870, and then agreed that an additional $10,000 would adequately compensate the young girl for her lost future supplementary gifts and allowances. He also indicated that he had assumed Sledge would pay for his child's college education and did not consider other potential resources such as scholarships, grants, or part-time employment.
A jury's finding of fact may not be set aside on appeal in the absence of manifest error or clear wrongness. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). This principle applies equally to the fact-trier's reasonable evaluations of expert testimony. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990); Durkee v. City of Shreveport, 587 So.2d 722 (La.App. 2d Cir.1991), writ denied, 590 So.2d 68 (La.1991). Consequently, we find no manifest error or abuse of discretion in the jury's decision to accept a value for loss of support very close to that calculated by plaintiffs' expert on cross examination. Clearly, the record provides a sufficient basis for the award.

Wrongful Death: Loss of love, affection, and society
Both appealing defendants contend that the jury abused its discretion by awarding almost $250,000 to Leigh for the love, affection, and society lost by the premature death of her father. Viewing the evidence in the light most favorable to plaintiff, we agree and reduce the award.
Wrongful death awards may be based on the degree of affection with the deceased, the amount of guidance needed by the minor, and the closeness of the family relationship. Buckbee v. Aweco, Inc., 626 So.2d 1191 (La.App. 3d Cir.1993), writ denied, 631 So.2d 1162 (La.1994). In making this evaluation, the court may consider custody arrangements resulting from a divorce or separation of the child's parents. See Cheramie v. Brunet, 510 So.2d 700 (La.App. 1st Cir.1987), writs denied, 513 So.2d 1209, 1215 (La.1987); Raymond v. Deaton, 423 So.2d 724 (La.App. 1st Cir.1982).
Concerning Leigh's relationship with her father, plaintiffs presented their own testimony, *817 as well as that of the deceased's close friend, and his brother-in-law. They indicated that the young girl and Sledge had a "very close relationship," went camping and horseback riding, and participated in a father-daughter organization called Indian Princesses. Furthermore, Georgia stated the minor's visitations surpassed the holiday schedule and two weekends per month allowed by the custody settlement.
Notwithstanding such declarations that Leigh had a "special relationship" with her father and had been "the apple of his eye," the attention he gave to the child is not shown to go beyond the usual father-daughter relationship. Nor, obviously, can we overlook the fact that she had not lived regularly with him since the age of four. The girl herself characterized the loss as precluding her from being with her father, like her friends could. However, she appears to have accepted his death, gone on with her life, and suffered no uncommon aftermath of the occurrence. Even viewing the evidence in a light most favorable to plaintiffs, we find nothing reflecting that this situation exceeded the typical parent-child relationship under the circumstances. Hence, in awarding $247,815 for loss of love and affection, the jury abused its discretion.
Upon reaching that initial determination, as directed in Youn and Reck, through careful consideration of the facts and circumstances posed by the present case, we next resort to prior awards for guidance. In Thomas v. State Farm Ins. Co., supra, after recognizing that wrongful death awards to minors could range up to $150,000, this court reduced the sum granted a teenager in a close-knit, loving family to $100,000. Predictably, in their brief, plaintiffs call attention to more favorable awards from other circuits; however, each cited instance involved extraordinary circumstances and/or intact families. See, e.g., Mathieu v. State, DOTD, 598 So.2d 676 (La.App. 3d Cir.1992), writ denied, 600 So.2d 665 (La.1992); Brooks v. City of Baton Rouge, 558 So.2d 1177 (La.App. 1st Cir.1990), writ denied, 566 So.2d 982 (La. 1990); Buckbee, supra. Of course, the seven-year lapse since Thomas cannot be disregarded. Yet, even if we assume arguendo that a higher range would now prevail for the close-knit Thomas family, such a situation is not disclosed by the case sub judice. Instead, we are convinced that $150,000 constitutes the highest possible sum appropriate under these particular facts. For a comparison, see Ingram v. Caterpillar Machinery Corp., 535 So.2d 723 (La.1988) (delineating $100,000 to $150,000 awards to minor boys); Murphy v. K.D. Auger Trucking, Inc., 598 So.2d 443 (La.App. 2d Cir.1992), writ denied, 600 So.2d 685 (La.1992) (affirming $140,000 to each of two children); Bergeron v. Blake Drilling & Workover Co., Inc., 599 So.2d 827 (La.App. 1st Cir.1992), writs denied, 605 So.2d 1117, 1119 (La.1992) (affirming $150,000 award to minor for wrongful death elements other than loss of support).

Leigh's Personal Injuries
Continental additionally argues, with respect to Leigh's personal injuries, that the $100,000 award is excessive. Again, we agree.
Generally, mental pain and suffering creates a claim for damages separate and distinct from physical pain and suffering. Harris v. Pineset, 499 So.2d 499 (La.App. 2d Cir.1986), writs denied, 502 So.2d 114, 117 (La.1987); Stewart v. Select Ins. Co., 631 So.2d 599 (La.App. 3d Cir.1994). Even so, without belaboring each element, the proper question is whether the total general damages award constitutes an abuse of discretion. Stewart, supra.
As a result of the accident, Leigh sustained a lacerated chin, general bruises and abrasions, and a closed fracture of the left femur. After being transported to a hospital in Hattiesburg, Mississippi, she underwent manipulative reduction of the fracture, in addition to the surgical insertion of a pin for traction. Ten days later, at her mother's request, the doctor placed the patient in a cast for transfer to a hospital near her home in Shreveport. There, the orthopedist removed the cast and continued traction after again inserting a femoral pin. At the end of July, in preparation for her discharge from the hospital three days later, the treating physician applied a fiberglass spica cast which facilitated walking on one leg with crutches. Physical therapy started in September following *818 removal of the cast, and complete recovery occurred by January 1991.
Leigh's injuries, although serious, do not warrant the overly generous sum awarded by the jury. Both she and her mother stated that she suffered pain and embarrassment during her stay in the hospital; however, the doctors responded to her discomfort with medications and characterized her as a "stoic young lady." Additionally, some of her problems resulted from Georgia's insistence upon removing the child to Shreveport, despite concerns expressed by the treating physician.
During her hospital stay, Leigh reported nightmares and stated that she worried whether her leg would be normal after treatment. Evidently, any such problems ceased when she went home. While hospitalized, she played Nintendo and other games, watched television and videos, and even had friends sleep over in her room. Upon leaving the hospital, she succeeded in starting school at the beginning of the academic year, attending half-days and utilizing a tutor for her other subjects. After about a month, she returned to a normal schedule, and even received straight A's. Most importantly, Leigh had fully recovered seven months after the accident and had no residual effects. She has resumed all her normal activities, including cheerleading, basketball, and softball. Given this record, we find the jury abused its discretion in assessing $100,000 in damages for these injuries. We thus turn to other awards.
Our research reveals one case involving a quite comparable leg injury and subsequent treatment. See Melerine v. State, 505 So.2d 79 (La.App. 4th Cir.1987), writ denied, 507 So.2d 226 (La.1987) (affirming $20,000 award to ten-year-old with fractured femur requiring pin insertion, traction, and spica cast, but who still suffered a slight curving of the bone). The jurisprudence largely concerns minor injuries with no complications, or major wounds causing permanent impairments. See, e.g., Briggs v. Hartford Ins. Co., 532 So.2d 1154 (La.1988) ($30,000 not excessive for broken leg and permanent facial scarring); Roberts v. State, DOTD, 576 So.2d 85 (La.App. 2d Cir.1991), writ denied, 581 So.2d 685 (La.1991) (award lowered to $150,000 for concussion and other injuries, together with compound femur fracture extending into knee joint and requiring pain relievers even at time of trial, and resulting in 25 percent disability); Humphries v. La. Dept. of Public Works, 545 So.2d 610 (La.App. 3d Cir. 1989), writ denied, 548 So.2d 1249 (La.1989) ($100,000 general damages award, that could have included as much as $40,000 for future lost wages, not excessive for eye injury and severely broken leg requiring insertion of pin, and resulting in a permanent limp due to shortened leg); Coleman v. Jackson, 422 So.2d 179 (La.App. 3d Cir.1982) (awarding $40,000 for fractured right femur requiring 48 days of traction and insertion of pin, and causing about one and one-half inch shortening of leg with thirty percent disability in that extremity). In comparison, we find the highest appropriate aggregate award for Leigh's general damages to be $75,000. Accordingly, we reduce the sum for physical pain and suffering to $50,000 and the amount for mental pain and suffering to $25,000.

EFFECT OF SLEDGE'S NEGLIGENCE
In another assignment of error, Continental and Jane Lefebvre Sledge contend that, because plaintiffs did not allege any negligence on the part of Sledge, the entire recovery should have been reduced by that amount of fault (fifty percent) attributable to him. We agree.
In an apparent effort to avoid the wrongful death award being proportionally reduced by any fault on the decedent's part, see Guidry v. Frank Guidry Oil Co., 579 So.2d 947 (La. 1991), plaintiffs carefully crafted their petition so as not to factually allege any manner of personal negligence by Sledge. Indeed, throughout the trial, plaintiffs steadfastly maintained that the accident resulted solely from the fault of James. Yet, despite this ploy, Jane Lefebvre Sledge alluded to the father's individual fault in a pretrial memorandum and received leave of court, on the eve of trial, to amend her answer to assert an affirmative defense of comparative fault.[6] *819 Thereafter, plaintiffs made no effort to alter their pleadings, nor do they now assign error to the sanctioning of the amendment.
Following the verdict, a major dispute developed as to whether plaintiffs could recover any portion of the damages attributable to Sledge's fault. Finally, accepting plaintiffs' position, the trial judge concluded that introduction of the affirmative defense evidence had expanded plaintiffs' pleadings to seek recovery for the father's individual acts of negligence.
We cannot agree with that proposition, however. The expansion of pleadings by evidence adduced at trial is governed by LSA-C.C.P. Art. 1154 which states, inter alia:
When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleadings.
Under this provision, evidence admitted without objection automatically enlarges the pleadings only when it is not pertinent to any other issue raised by the formal assertions of a party and, hence, would have been excluded if objected to timely. Roberson v. Provident House, 576 So.2d 992 (La.1991); Pond v. Campbell, 251 La. 921, 207 So.2d 535 (1968); Diesi Leasing, Inc. v. Morrow, 542 So.2d 838 (La.App. 3d Cir.1989), writ denied, 548 So.2d 329 (La.1989). Conversely, if evidence is admissible for any other purpose, it does not serve to enlarge the pleadings without the express consent of the opposing party. Diesi Leasing, supra; Wallace v. Hanover Ins. Co. of N.Y., 164 So.2d 111 (La.App. 1st Cir.1964), writ refused, 246 La. 598, 165 So.2d 486 (1964).
In the present scenario, with evidence of Sledge's fault properly admissible in reference to the comparative negligence contention, an objection would not preclude its introduction. Hence, the petition did not undergo an expansion to add factual allegations affording recovery for the deceased's acts or omissions, and the trial judge erred in so ruling.
Granted, as plaintiffs contend, citing Cox v. Heroman & Co., 298 So.2d 848 (La.1974), the "theory of the case" has been abandoned and any relief may be granted to which a party is entitled. That argument, however, fails to recognize that such a result may obtain only where the facts constituting the claim have been pled or, indeed, where an expansion of the pleadings has transpired. Essentially, the petition must set forth the facts upon which recovery can be based. Otherwise, a defendant has neither adequate notice of the allegation nor an opportunity to counter it. Any other approach would greatly eliminate the requirement of "fact pleading" in Louisiana. See LSA-C.C.P. Art. 891, Comment (a).
Nor is the present issue, as plaintiffs would have it, whether the estate of Sledge had been made a party to the litigation. Instead, the issue is whether plaintiffs alleged facts reflecting personal fault by Sledge in causing the accident.
Plaintiffs clearly made a calculated effort to predicate their recovery entirely on James's negligence, a position admitted on appeal and maintained throughout the trial.[7] Furthermore, even after the affirmative defense had been added, they failed to amend their petition. Had they done so, a request for a continuance likely would have ensued. With respect to Continental, a defense against assertions of Sledge's negligence could well assume strategies different from, and even in conflict with, a defense against only James's fault.
Neither are there any contentions that Leigh contributed to her own injuries. See LSA-C.C. Art. 2323. Rather, this is a case of comparative negligence, i.e., the jury determined that plaintiff's damages resulted from the fault of two other persons. See LSA-C.C. Art. 2324. And, notwithstanding that recovery had only been sought for the substandard conduct of one of those persons, *820 the trial court granted judgment against both tortfeasors.
Simply stated, plaintiffs did not at any time allege or seek to recover for the acts of Sledge and, in our view, cannot do so post-trial. To the contrary, they are entitled to an award based solely upon James's substandard conduct. See LSA-C.C. Art. 2324. The judgment will therefore be amended accordingly.

CONCLUSIONS
For the forgoing reasons, we amend the judgment to reduce the recovery of Georgia R. Sledge, as tutrix, to $138,592.50, and her individual award to $20,302.60. In all other respects, the district court judgment is affirmed. Costs of appeal are assessed equally among plaintiffs, Continental, and Jane Lefebvre Sledge.
AMENDED IN PART; AFFIRMED AS AMENDED.
NOTES
[1] In the first of three marriages, Sledge wedded Jane Lefebvre Sledge in June 1973. The couple divorced in January 1978 with James as their only child. The next matrimonial union had been to Georgia R. Sledge. That partnership produced one offspring, Leigh, but subsequently ended in January 1984. His third wife, Charlotte, died of cancer one month before the accident.
[2] This particular policy is a general insurance contract designed to provide, in one all-inclusive agreement, both liability and property protection usually purchased through separate homeowner, automobile, and personal indemnity coverages.
[3] The DeSoto Parish clerk's office may have concluded that only one record would be needed for both appeals. In any event, failure of the clerk to prepare and lodge the record shall not prejudice any applicant. LSA-C.C.P. Art. 2127.
[4] Beyond contesting the guest passenger charge as a whole, the assignment complains of the following instruction concerning the apportionment of fault:

James ... Sledge alleges that if, for any reason, the jury should decide that James ... was guilty to any degree, then he urges that ... Randolph Sledge was also negligent.
It is argued that the wording implied the necessity to find fault on the part of James before the issue of Sledge's fault could be reached.
[5] Blacks Law Dictionary 750 (6th ed. 1990), defines "immediately" as: "Without interval of time, without delay, straightaway, or without any delay or lapse of time."
[6] On the same date, in moving to have the jury apportion fault, Continental noted that plaintiffs had solely alleged the fault of James, although the "evidence ... may show that ... Sledge was guilty of personal negligence."
[7] Plaintiff's attorney told the jury in his closing statement: "If you were to find [Sledge] 100 percent at fault, [Leigh] will get zero."